# Federal Defenders
## OF NEW YORK, INC.

Eastern District
One Pierrepont Plaza, 16th Fl., Brooklyn, NY
11201 Tel: (718) 330-1200  Fax: (718) 855-0760

Tamara L. Giwa
*Executive Director and
Attorney-in-Chief*

Michelle A. Gelernt
*Attorney-in-Charge*

February 18, 2025

The Honorable Dora L. Irizarry
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:  *United States v. Justinna Boatwright*, 23-CR-488 (DLI)

**"How do you find your way in life when the most precious thing in your life is gone?"**

Dear Judge Irizarry:

I submit this letter in advance of Ms. Boatwright's sentencing on February 25, 2025.

"How do you find your way in life when the most precious thing in your life is gone?" This is a question Ms. Boatwright has mulled over repeatedly since her uncle and grandmother—two of the people who raised her—passed away between January and April 2021. Ms. Boatwright agreed to facilitate the instant transactions in a moment of emotional and financial distress, following the back-to-back deaths of her uncle and grandmother and the subsequent loss of her full-time work as a security guard. She is deeply remorseful for her conduct and regrets the danger and harm that the firearms she helped sell could have posed to her community.

Ms. Boatwright has worked hard over the past 15 months to reflect upon her poor decisions and the root causes that led her life to spiral out of control, and to ensure that she never finds herself in that dark place in the future. More than 15 years after she dropped out of college, she re-enrolled at Kingsborough Community College in Fall 2024, where she hopes to finally complete her undergraduate degree in sports medicine and therapy. She has continued to work multiple jobs with Citi Bike, UBS Arena, and Hertz to maintain financial security and independence, and she managed to secure a stable, peaceful apartment after navigating the New York City shelter system.

For the reasons set forth below, I respectfully ask that the Court impose a probationary sentence, which would give Ms. Boatwright the chance to continue on the right path—a path she has finally found and begun charting.

1

## I.    Background

On paper, Justinna Boatwright—"Tinna," to her family and friends—was raised by both parents and had an abuse-free childhood. But her childhood was hardly marked by stability. Although her parents, Gwendolyn and Kevin, had seven children together, they never married. According to her father, Gwendolyn had been the love of his life since middle school. But according to Gwendolyn, they were never in a relationship. Perhaps because of these conflicting narratives, her father played little role in Ms. Boatwright's childhood, despite living in the same city.

Ms. Boatwright rarely complains about much in life. But things have not always been easy. Her mother, Gwendolyn, dropped out of school as a teenager and throughout Ms. Boatwright's childhood, she struggled to find work without a high school degree. For years, until Ms. Boatwright was approximately 14 years old, her mother depended on public assistance and food stamps to support Ms. Boatwright and her seven siblings. Finally, after Gwendolyn went back to school, she got a job as a home health aide, which brought marginally more financial stability to the household. Her mother had to move their family frequently to find enough space for all eight kids—first to Hollis, then Far Rockaway, and later West Hempstead, Long Island.

For most of her childhood, Gwendolyn left Ms. Boatwright and her older brother Darnell with her grandmother. In addition to Ms. Boatwright's grandmother, her uncle Larry and a rotating cast of aunts, uncles, and cousins shared her grandmother's home. Larry was the closest to the father figure Ms. Boatwright had in her life. He went to the hospital with Gwendolyn for the birth of each of her eight children, and always looked out for them as if they were his own. He lived in the basement of her grandmother's home for many years and when he moved with his wife and son, they only moved a couple blocks away.

Ms. Boatwright was forced to adapt at an early age. Ms. Boatwright knew that she wasn't like other girls in the neighborhood, or at school. She wasn't interested in dolls and playing dress up. She knew early on that she was gay, but for a long time she didn't tell anyone. Sometimes she faced problems in the neighborhood because of how she dressed. But she never made a big deal about it or told anyone about them. She did her best to get along with others wherever she went.

Growing up, Ms. Boatwright loved sports, especially basketball. And she was good at basketball—really good. Ms. Boatwright spent most of the time she was not in school playing basketball at the park with her older brothers and their friends. She felt most comfortable when she was on the court, exceling and being valued for her skills. Her mother never had enough money to pay for sports equipment or basketball sneakers. But her uncle Larry saw her talent and would save up money to help her pay for the equipment she needed.

Standing 6'7", Larry had been in the NBA briefly, before getting injured. After retiring from basketball, he began working as a gym teacher at an elementary school and also for the Long Island Railroad. He had a work ethic Ms. Boatwright admired. Throughout her childhood, he devoted his days off to coaching her and pushed her to the limits of her potential. She always prided herself on being able to pull her own weight on the court, even among boys older than her. Scouts from the travel teams would come to the park and watch their games, and by age 10, Ms. Boatwright had been recruited to play on a boys' travel team. From age 10-14, she played on several different AAU teams; it wasn't until high school that she began playing on girls' teams.

Her brother Bernard was six years older than her and her brother Darnell was two years older. Darnell lived with Ms. Boatwright and their grandmother throughout her childhood and, along with Larry, introduced Ms. Boatwright to basketball. Their grandmother kept Ms. Boatwright and Darnell on a strict curfew, concerned about the dangers they could face in Hollis. But Bernard would bounce around between friends' homes, rarely staying with their mother or grandmother for longer than a couple days. By age 16, Bernard found himself locked up at Rikers. Ms. Boatwright only saw Bernard sporadically and never knew what he was getting into, but she tried to maintain a positive relationship with him when she did see him.

Ms. Boatwright eventually went on to play point guard on the women's basketball team at York College. Even as a freshman, she regularly led the team in points and assists. At age 18, everything seemed possible. Ms. Boatwright hoped to pursue a degree in computer science and eventually become a computer engineer. Her favorite movie was Love and Basketball, and she was now living her dream of playing women's college basketball. But after her mother was diagnosed with cervical cancer and struggled to work and care for Ms. Boatwright's younger siblings, that all changed. She dropped out before finished her freshman year so that she could work full-time and help care for her mother and support her younger siblings.

Ms. Boatwright worked hard to find consistent work, but she always regretted dropping out of college. She regretted losing the opportunity to get her degree and losing her dream of playing college basketball. She worked steadily—for UPS as a package helper, as a security guard, and as a babysitter—and was able to make ends meet. But in 2021, things began to fall apart.

In January 2021, Ms. Boatwright's uncle Larry passed away unexpectedly. She still does not know the cause of his death, except that it was a serious medical condition he kept secret from everyone in the family. Larry's death shocked the family. He had always been the picture of health and fitness, and suddenly he was gone. Just three months later, her grandmother passed away. The back-to-back loss of two loved ones who raised her was devastating for Ms. Boatwright. In addition to processing her own grief, as the eldest daughter in their family, Ms. Boatwright was her mother's primary emotional support.

Several months later, Ms. Boatwright lost her job as a security guard with ProCore, due to internal issues at the company. She found work doing security at UBS arena, which had recently opened in Elmont, Long Island. But the arena only needed her for special events and Ms. Boatwright soon found she was not getting regular enough hours to make ends meet.[1] She fell behind on rent, and she began trying to find side hustles to make up the difference. She started working as a party promoter, helping set up baby showers, birthdays, and special events at local bars. She would enter contests on the Footlocker app, where you could win sneakers, and would then resell them for a profit.

Ms. Boatwright knew lots of people from different walks of life, and she had a kind, open-minded approach to people. But the very traits that make Ms. Boatwright so beloved by her friends and family were also her downfall. By "going along to get along," Ms. Boatwright soon found herself connecting an undercover who contacted her seeking guns with an acquaintance who sold them. She

---

[1] Ms. Boatwright's tax returns for 2021 reflect that she made only $7,733 in 2021, compared to $48,071 in 2022 and $38,085 in 2023. *See* PSR at ¶ 53.

3

Case 1:23-cr-00488-DLI    Document 35    Filed 02/19/25    Page 4 of 12 PageID #: 157

didn't know much about guns—the types, brands, whether they were capable of accepting large capacity ammunition or not. She had never owned a gun or shot a gun. But she desperately needed cash and was confronted with an opportunity to make it.

> **II.    Ms. Boatwright's conduct since December 2022 shows that this was a serious aberration, motivated by extenuating personal and financial distress.**

Ms. Boatwright was charged with engaging in three transactions with an undercover between October 25 and December 6, 2022. She was arrested nearly a year later, on November 28, 2023, and released on bond the same day.

Instead, Ms. Boatwright secured two additional jobs to supplement her work at UBS arena—working as a bike mechanic for Citi Bike and transporting rental cars for Hertz. Eventually, she was promoted from being a security guard at UBS to being a guest experience supervisor. Ms. Boatwright was able to rent an apartment with two of her younger sisters. One of her sisters, Janae, suffers from schizophrenia and was unable to manage acts of daily living on her own. Ms. Boatwright helped Janae with daily tasks, attending doctors' appointments, managing her Social Security benefits, and household tasks.

By the time of her arrest on November 28, 2023, Ms. Boatwright had largely gotten her life back on track. ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████

Her first ever arrest, at age 33, caused Ms. Boatwright to seriously reevaluate her life—where she was and where she wanted to be. After being out of school for over a decade, Ms. Boatwright reapplied to college. In September 2024, she enrolled at Kingsborough Community College, where she hopes to pursue a major that combines her love of basketball with a foundation that will allow her to pursue a career she loves: sports management and therapy. She took English Composition, Introduction to Sports Management, Leadership in Recreation and Physical Education, and Effective Public Speaking. She successfully completed her first semester in December 2024. She is currently taking General Psychology and Introduction to Sociology during winter term. This spring, she is enrolled in English Composition II, Concepts of Wellness, Introduction to Recreation and Physical Education, Sports and American Society, and Fundamentals of Business.

Ms. Boatwright balanced returning to school while continuing to work multiple jobs, with UBS and Citi Bike, and navigating unexpected housing instability over the past year. In January 2024, the lease for the apartment she had rented with her sisters expired. With Ms. Boatwright's assistance, her younger sister Janae secured and moved into supportive housing, where she could receive full-time support for her schizophrenia. Her sister Jaelyne moved to Albany to live with their other sister and her family there. With no savings to help pay for the costs of a new apartment, Ms. Boatwright moved in with her girlfriend, Taniyah, and her family. They lived together for approximately nine months, but ultimately decided to end their relationship. Although the breakup was amicable and they remain on good terms, Ms. Boatwright suddenly found herself with nowhere to live.

Becoming homeless just after she returned to college made balancing school and work even harder. But Ms. Boatwright was determined not to let this derail her goals. She entered the New York City women's shelter system in September 2024. Her housing specialist, Diamonasia Brown, at the HelpUSA women's shelter where she lived for several months describes her as "one of my standout clients." *See* Exh. B, Letter from Diamonasia Brown. Ms. Brown reports,

> During her time at the shelter, Ms. Boatwright was surrounded by 65 other women, many of whom faced difficult circumstances. Despite the challenges and drama surrounded her, Ms. Boatwright remained focused on her goals, prioritizing her education and employment. She successfully moved out without any issues, exemplifying a high level of responsibility and determination.
>
> In addition to myself, Ms. Boatwright's perseverance, optimism, and strong work ethic were admired by the shelter's staff, including the Director. She was a positive role model for the other women at the shelter, demonstrating leadership and resilience.

*Id.*

After entering the shelter, Ms. Boatwright began saving money so that she could meet the necessary requirement for moving into an apartment of her own—five times her portion of the monthly rent. She quickly saved approximately $3,000 within her first two and a half months at the shelter, and she was able to sign a lease and move into her new home just before Christmas. *See id.*; Exh. I, Boatwright 2025 Lease (redacted).

In fall 2024, Ms. Boatwright also independently sought out and began working with Focus Forward, a non-profit organization that offers educational programming focused on reentry to people charged in federal court. Ms. Boatwright participated in weekly classes, as well as independent reading and journaling, over the course of three months. While some people might feel overwhelmed by an additional commitment, Ms. Boatwright found Focus Forward helped motivate her to push through her final exams at Kingsborough Community College, find stable housing, and stay positive in the face of uncertainty surrounding her pending case. Her teachers from Focus Forward write:

> Tinna was an active participant in our class, coming prepared for each meeting, doing all homework assignments, and quickly became a leader to her classmates. Tinna was also candid and open in the way that she shared her personal experiences, helping other class members feel comfortable talking about their own stories. One week, while presenting to our class as part of a public speaking exercise, Tinna opened her remarks: "How do you find your way in life when the most precious thing in your life is gone?" The question that she posed became an excellent starting point for us in understanding Tinna's past and her desire to turn her life around. She explained to us how after the death of her two closest family members, she felt like her life was spiraling out of control, leading her to make a series of poor decisions. She expressed both remorse for her actions and a deeply reflective perspective on where she was, what went wrong, and where she intends to go. Tinna told us that, in time, her outlook on life evolved, and she began to consider those she lost as her "guardian angels" guiding her down a newly discovered "right path." We saw clear evidence of this in her words and actions. Each week, Tinna updated us on her progress since our last meeting, telling us how

she passed her college exams, performed on her school's basketball team, sought mental health care, worked hard to provide for herself, and more.

Exh. A, Letter from Megan Rodriguez and Trent Ullrich, Focus Forward.

Ms. Boatwright began practicing with Kingsborough's women's basketball team this winter. The coach had reached out when Ms. Boatwright first applied to Kingsborough—he had looked up her stats from when she was at York College and wanted to know if she was still interested in playing, despite now being 17 years older. She said yes. At age 34, she has been working hard to get back in shape and keep up with the 18-year-olds, and the coach has invited her to officially begin playing on the team this coming fall. Ms. Boatwright is thrilled to finally be back on the court and regain confidence in the sport that has always been her passion.

### III.   The applicable Sentencing Guidelines do not accurately reflect Ms. Boatwright's culpability in the instant offense.

Ms. Boatwright has no objection to the Guidelines calculation set forth in the presentence report ("PSR"). However, as the Court is aware, the 46-57 month Guidelines range set forth in the PSR is dramatically higher than the 15-21 month range calculated by the parties in the plea agreement. Ms. Boatwright "had a reasonable expectation that the Government would not press the Court for an enhanced offense level in the absence of new information." *United States v. Wilson*, 920 F.3d 155, 164 (2d Cir. 2019) (citation and internal quotations omitted). In recognition of that, and out of a well-placed and commendable sense of fairness consistent with Second Circuit precedent, the government has indicated it will stand by its plea agreement and the Guideline range of 15-21 months. *See United States v. Boatwright*, 23-CR-488 (DLI), Dkt. No. 31.

Two of the sentencing enhancements applied in this case were created as a result of the Sentencing Commission's justified concerns about (1) the dangers posed by particular types of firearms and, (2) the alteration of serial numbers. These enhancements impose strict liability—if the offense involved a firearm with a specified characteristic, regardless of whether the defendant *knew* it did, the enhancement applies.

### A. The Court should vary downward because the eight-level enhancement for a "semiautomatic firearm that is capable of accepting a large capacity magazine" overstates Ms. Boatwright's culpability.

The Probation Department issued a second addendum to the PSR on January 13, 2025, adding an 8-level enhancement under Section 2K2.1(a)(4)(B)(I), based on the determination that one of the firearms involved in the offense, a .22 caliber Glock semi-automatic pistol, was a "semiautomatic firearm that is capable of accepting a large capacity magazine." Upon review of NYPD laboratory reports and product specifications, the parties agree with this determination. But unlike military-grade assault rifles like an AR-15 or AK-47, the pistol triggering this enhancement is compact and was

6

designed for recreation, not military applications. To the untrained eye, the pistol itself does not suggest that it would be "capable of accepting a large capacity magazine."[2]

Ms. Boatwright did not specifically seek out this type of firearm or an extended magazine. She now recognizes the recklessness of her behavior and regrets the significant harm that could have been caused by such a weapon. But the imposition of an eight-level enhancement under these circumstances dramatically increases Ms. Boatwright's Guidelines based on facts she did not know or intend. Without this enhancement, the Guidelines calculated by probation would have been 18-24 months. *See* PSR at ¶ 59.

**B. The Court should vary downward because the four-level enhancement for defaced serial numbers overstates Ms. Boatwright's culpability and does not promote deterrence.**

As with the enhancement for semiautomatic firearms capable of accepting a large capacity magazine, the Guidelines impose strict liability for firearms with defaced or altered serial numbers. The Sentencing Commission has indicated that this enhancement reflects the difficulty in tracing illegal firearms caused by altered serial numbers, the increased demand for such firearms, and consequent challenges to getting them off the street. *See* USSG App. C, Amend. 691 (Nov. 1, 2006) ("This increase reflects both the difficulty in tracing firearms with altered or obliterated serial numbers, and the increased market for these types of weapons."); *see also* USSG App. C, Amend. 819 (Nov. 1, 2023) (explaining PMFs "share the traits that led the Commission to implement a 4-level enhancement for firearms with altered or obliterated serial numbers" namely "difficulty in tracing firearms with altered or obliterated serial numbers" (citation and quotation marks omitted)). These are laudable goals, and the imposition of strict liability surely saves the government (and the Court) from expending substantial resources that might be spent determining whether a defendant *knew* the serial number had been altered.

Imposing a dramatically more punitive sentence based on facts Ms. Boatwright was unaware of does little to promote deterrence. *See, e.g.*, *United States v. Handy*, 570 F. Supp. 2d 437, 478, 479 (E.D.N.Y. 2008) (Weinstein, J.) (Strict liability enhancement for possession of a stolen firearm is an ineffective deterrent "since a person cannot be deterred from doing what he or she does not know is being done."). Here, only the first two of four firearms transferred to the undercover had altered serial numbers. This was not the product of any intentional procurement or other act by Ms. Boatwright; she did not even realize the serial numbers had been altered before delivering them to the undercover. The two subsequent firearms did not have altered serial numbers. If anything, the existence of an intact serial number on two of the firearms and a defaced number on the other two reflects a *lack* of intention and control over the supply on Ms. Boatwright's part, not an intent to evade law enforcement detection or tracing.

**C. The policy considerations and empirical data supporting U.S.S.G. § 4C1.1 and § 5C1.1 weigh in favor of a probationary sentence.**

---

[2] Defense counsel notes that an extended magazine was transferred with the firearm to the undercover; the government confirmed that the firearm was not loaded with the extended magazine at the time of transfer. *See* Second Addendum to the PSR (dated Feb. 12, 2025).

Ms. Boatwright has no prior criminal convictions, giving her a criminal history score of zero.[3] Under Section 4C1.1, "zero-point offenders" like Ms. Boatwright receive an additional two-level reduction. *See* U.S.S.G. § 4C1.1. The two-level reduction under does not apply, however, if a defendant "possess[ed], receive[d], purchase[d], transport[ed], transfer[red], s[old], or otherwise dispose[d] of a firearm or other dangerous weapon (or induce[d] another participant to do so) in connection with the offense," among other carveouts, including offenses that resulted in death of serious bodily injury, the use of violence or credible threats of violence, and sex offenses. U.S.S.G. § 4C1.1(a). Ms. Boatwright did not personally own or keep a gun. She did not brandish or use a gun in connection with this offense or any other offense. She knew very little about guns. But because of the nature of the offense, she does not receive a two-level reduction for being a zero-point offender.

However, the policy behind § 4C1.1 remains relevant. The Sentencing Commission's rationale for providing an additional two-level reduction is grounded in the Commission's analysis of recidivism data, which shows that "offenders with zero criminal history points have considerably lower recidivism rates than other offenders, including offenders with one criminal history point." *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/researchreports/recidivism-federal-offenders-released-2010. This data and the Commission's analysis remain particularly relevant where Ms. Boatwright's conduct was limited to three transactions over the course of two months, and she disengaged from this conduct prior to her arrest.

Another Guidelines provision, Section 5C1.1, states that "[a] departure, *including a departure to a sentence other than a sentence of imprisonment*, may be appropriate if the defendant received an adjustment under § 4C1.1 (Adjustment for Certain Zero-Point Offenders) and the defendant's applicable guideline range overstates the gravity of the offense because the offense of conviction is not a crime of violence or an otherwise serious offense." *See* U.S.S.G. § 5C1.1, n. 10(B) (proposed 4/5/23) (citing 28 U.S.C. § 994(j)). Ms. Boatwright's offense of conviction—unlicensed firearms dealing, in violation of 18 U.S.C. § 922(a)(1)(A)—is not a crime of violence. And although any offense involving firearms could be described as "serious," the nature and circumstances of Ms. Boatwright's involvement are not particularly aggravated. She did not personally use the firearms to engage in violence or other criminal conduct, nor did anyone else. She is fortunate that, because the firearms were sold to an undercover, none of the firearms resulted in bodily injury nor were they used to commit any other offense.

The Court should consider the Sentencing Commission's guidance under §§ 4C1.1 and 5C1.1 and impose a probationary sentence, as authorized by the Guidelines.

## IV.    The 3553(a) factors weigh in favor of a probationary sentence.

Ms. Boatwright's personal history and characteristics, her exemplary conduct on pretrial release, and the need for her to be able to continue the remarkable rehabilitation she has already begun, all weigh in favor of a non-custodial sentence.

---

[3] Ms. Boatwright not only has zero criminal history points; aside from the instant offense, she has never even been arrested.

### a. Ms. Boatwright's personal history and characteristics weigh in favor of a probationary sentence.

As many of her family members have observed, Ms. Boatwright is the "rock," or the "glue" that holds their family together. That was particularly true when their family suffered two major deaths back-to-back, of Ms. Boatwright's uncle Larry and her grandmother. But being strong for her loved ones, particularly her mother, buried the impact of these losses on Ms. Boatwright herself. When she began to struggle financially during the months following these deaths, she didn't want to burden her family by asking for help. She remained confident that through hard, steadfast work, she would pull through and be able to pay her back rent. As the months passed and her unpaid rent accumulated, Ms. Boatwright began to panic. She began promoting parties—baby showers, birthdays, special events at bars—and reselling sneakers for a profit. This is not how she envisioned her career, or even her job. But she became desperate for side hustles. It was in this state of emotional and financial desperation that she agreed to help procure guns for an undercover, who she met through an acquaintance.

It is abundantly clear from the letters submitted by Ms. Boatwright's family that she is a loving and devoted daughter and sister. Ms. Boatwright's mother, Gwendolyn writes, "When I was diagnosed with cervical cancer in 2007 she was right there by my side and never left. When my mother and brother passed away within months of each other in 2021 she was there with my other children as my Rock!!" Exh. C, Letter from Gwendolyn House. Her sister Jaelyne describes her as "the glue that holds our family together." Exh. E, Letter from Jaelyne Boatwright. Her sister Jaleshia confirms this, writing, "Justinna is the first person my siblings and her friends call on to seek advice from. Justinna has re-arranged her work schedule to assist our oldest sister with picking up her children before they moved to Albany, NY. Justinna has watch[ed] her friend's children while they worked when they could not afford childcare." Exh. D, Letter from Jaleshia Boatwright. When Jaelyne was struggling to find an affordable place to live, Ms. Boatwright offered to become her roommate.

Ms. Boatwright also became the primary caregiver for her other younger sister, Janae, who lived with her and Jaelyne. *See id.* Janae suffers from multiple mental illnesses, including schizophrenia, and Ms. Boatwright frequently assisted her with acts of daily living and psychiatric hospitalizations. *See id.* This past year, Ms. Boatwright helped Janae apply for and secure supportive housing.

A few months ago, Ms. Boatwright and her family learned that Janae was pregnant. The pregnancy raised concerns—Janae can barely care for herself, how would she be able to care for a baby? But Janae wanted to keep the baby. Ms. Boatwright loves her sister and wants her to be able to live the most normal, fulfilling life she can. She is committed to helping Janae care for the baby as much as she can.

Ms. Boatwright spent the first 32 years of her life focused on her family, basketball, and hard, honest work. She accepts full responsibility for her lapse in judgment that has led her here today. But more importantly, since her arrest, she has demonstrated her commitment to not only making amends for her past conduct, but also to improving herself. She has emerged from this dark moment in her life with newfound focus and purpose. That purpose is apparent not only to her family, but to everyone who knows her. *See, e.g.*, Exh. A-F, Letters of Support.

9

### b. The nature and circumstances of the offense weigh in favor of a probationary sentence.

The government does not allege that Ms. Boatwright facilitated the sale of firearms after the three transactions with the undercover between October to December 2022. She desisted from this conduct prior to her arrest. She found two additional jobs—working as a bike mechanic for Citi Bike and transporting rental cars for Hertz—rented an apartment with her younger sisters, and returned to prioritizing the things that matter most to her: family and work.



### c. A probationary sentence would best promote rehabilitation and deterrence and avoid significant collateral consequences.

Since her arrest on November 28, 2023, Ms. Boatwright's conduct on pretrial release has been exemplary. A probationary sentence would allow her to continue the remarkable progress she has made over the past 15 months. But even a short custodial sentence would have significant collateral consequences: the loss of her affordable housing, loss of three jobs she has now held for several years, and repayment of the financial aid she received from Kingsborough Community College.

The instant arrest—Ms. Boatwright's first ever—was a wakeup call for her. Almost everyone makes a mistake once in their life. Many people are fortunate to get a second chance. But for Ms. Boatwright, the instant offense marks the first time she has ever gotten in trouble with the law. Already, she will be permanently labeled a felon and face significant collateral consequences in finding employment, housing, and serving on a jury, among other forms of "civil death." These collateral penalties are significant, particularly for a 34-year-old with no prior criminal history whatsoever.

A custodial sentence is unnecessary to achieve just punishment, promote deterrence, or provide rehabilitation for Ms. Boatwright. She has more than learned her lesson. Not only has she maintained compliance with all conditions of release imposed by the Court since her arrest, she finally found the motivation to return to college, after dropping out more than 15 years ago. In spring 2024, she applied to Kingsborough Community College, received full financial aid, and began classes in September 2024. Ms. Boatwright has received $9,598.00 in financial aid for the Fall 2024 and Spring 2025 semesters. *See* Exh. G, Kingsborough Community College Records. If she were to withdraw or

10

otherwise fail to complete her coursework for the spring semester, she would be required to repay the financial aid she was awarded.[4]

Despite the challenges she has faced over the past year, Ms. Boatwright has persevered and maintained multiple jobs, secured stable housing that allows her independence, and remained focused on pursuing her education. Diamonasia Brown, her housing specialist at the women's shelter where she was living observed Ms. Boatwright's resilience and steadfast efforts firsthand. She writes, "Ms. Boatwright's perseverance, optimism, and strong work ethic were admired by the shelter's staff, including the Director. She was a positive role model for the other women at the shelter, demonstrating leadership and resilience. I wholeheartedly recommend Ms. Boatwright for any future endeavors and am confident that she will continue to achieve success in all aspects of her life." Exh. B, Letter from Diamonasia Brown, HelpUSA.

Ms. Boatwright's teachers at Focus Forward echo these sentiments: "Throughout the time we have worked with Tinna, we have come to know her as a young woman who is dedicated to learning from her past and working hard to build a better future for herself. She is kind, intelligent, and thoughtful. If given the opportunity, we are confident that Tinna will continue on the path towards bettering her life and being a wonderful community member." Exh. A, Letter from Megan Rodriguez and Trenton Ullrich, Focus Forward.

### d. A probationary sentence would avoid unwarranted sentencing disparities.

A Guidelines sentence would not only offer little deterrence, it would also create unwarranted sentencing disparities. *See* 28 U.S.C. § 991(b)(1)(B); USSC, *Fifteen Years of Guideline Sentencing* 113 (2004), http://tinyurl.com/2mab7yzr (recognizing that unwarranted disparities occur not only when there is "different treatment of individual[s] who are similar in relevant ways," but also when there is "similar treatment of individual[s] who differ in characteristics that are relevant to the purposes of sentencing." (emphasis omitted)). In Ms. Boatwright's case, the four firearms she was able to procure trigger a 12-level increase to her sentencing Guidelines, based solely on characteristics of the firearms that she did not specifically seek out or even realize existed. In contrast, a similarly-situated defendant with no prior criminal history who engaged in two firearms transactions with an undercover faced a Guidelines range of only 6-12 months.[5] *See United States v. DeJesus*, 23-CR-349 (RPK). Ms. DeJesus received a sentence of four years of probation.

Jose Miguel Marrero, Tony Terry's cousin who personally purchased firearms in Georgia and supplied 17 firearms to Mr. Terry between February 2022 to December 2022, was sentenced to six

---

[4] *See* Kingsborough Community College, *Withdrawals and the Return of Federal Financial Aid*, https://www.kbcc.cuny.edu/financialaid/return_fa.html#:~:text=If%20you%20have%20received%20your,unearned%20portion%20of%20your%20awards (last visited February 15, 2025).

[5] As noted in the government's sentencing submission, Ms. DeJesus's offense conduct involved two transactions with an undercover. *See United States v. DeJesus*, 23-CR-349 (RPK), Dkt. No. 29 at 2. She attempted to sell two firearms in the second transaction—which would have triggered an additional enhancement for the number of firearms under U.S.S.G. § 2K2.1(b)(1)(A). But because her supplier was unable to provide two firearms for the second transaction at the last minute, her Guidelines range did not include the two-level enhancement.

months in Bureau of Prisons custody.[6] *See United States v. Marrero et al.*, 23-CR-00012-JRH-BKE, Dkt. No. 70, Amended Indictment (October 19, 2023). But because none of the 17 firearms did not have defaced serial numbers and, apparently, were not "capable of accepting a large capacity magazine," Mr. Marrero's Guidelines range was 33-41 months—lower than Ms. Boatwright's. ████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████ Like Ms. Boatwright, Mr. Marrero had no prior criminal history. However, the nature of Ms. Boatwright's involvement in the instant offense—serving as a middleman for the transaction of four firearms to an undercover in New York City over the course of a little more than two months, as compared to serving as a key source of supply personally purchasing 17 firearms for out-of-state sale to a convicted felon over the course of 10 months—was much more minimal than Mr. Marrero's. Additionally, her cessation from the criminal conduct prior to her arrest, ████████████████████████████ and the remarkable efforts she has made towards rehabilitation since her arrest underscore how aberrant her involvement in the instant offense was. If a six-month sentence was appropriate in Mr. Marrero's case, a probationary sentence is certainly appropriate and just for Ms. Boatwright.

## V.    Conclusion

A jail sentence would derail the significant efforts Ms. Boatwright has made since December 2022 to not just get her life back on track, but to achieve long-term financial and emotional stability, remain the strong support for her family that she always has been, and complete her higher education so she can ensure she never finds herself in this position ever again. A probationary sentence would allow Ms. Boatwright the chance to continue pursuing the remarkable efforts she has begun. If given one chance at redemption, Ms. Boatwright will not squander it.

Thank you for your consideration.

Respectfully Submitted,

_____/s_____

Nora K. Hirozawa
Counsel to Justinna Boatwright
Federal Defenders of New York, Inc.
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201
(718) 330-1290

cc:    AUSA Raffaela Belizaire
       PO Jennifer Baumann

---

[6] The PSR indicates that Mr. Marrero was sentenced to 18 months in BOP custody and 3 years supervised release. *See* PSR at ¶ 3, n. 1. That was correct, at the time the PSR was issued, on September 20, 2024. However, on November 14, 2024, an order was entered under seal reducing Mr. Marrero's sentence to 6 months custody. *See United States v. Marrero et al.*, 23-CR-00012-JRH-BKE (S.D.G.A. Nov. 14, 2024), Dkt. No. 142. ████████████
████████████████████████████████████████████████████████████████████████